(*Circuit Court of the United States. Northern District of Illinois.*)

### Charles S. Crane and Jefferson Hodgkins, Petitioners,

#### vs.

### Albert Conro, Willard S. Carkin, Harry Fox and Bradford Hancock, Assignee, Respondents.

1. BANKRUPTCY—JURISDICTION OF CIRCUIT COURT TO REVIEW ORDER OF DISTRICT COURT. Under sec. 4986 of the Rev. Stat. U. S., the circuit court has jurisdiction to review all cases and questions arising under the bankruptcy law where the law has not otherwise provided for an appeal.

2. SAME—SETTING ASIDE SALE AFTER CONFIRMATION—NOTICE TO PUR-
CHASER. It is error to set aside an order confirming an as-
signee's sale upon the *ex parte* application of the assignee with-
out giving the purchaser notice and hearing.

3. ASSIGNEE'S SALE—WHEN PURCHASE MONEY IS PAYABLE. After the
sale of the property of a bankrupt the purchaser is not bound
to pay the purchase money *instanter*. The purchaser is en-
titled to ascertain how and to what extent the property could
be delivered to him, and whether or not the order of the court
could be complied with before he can be required to pay the
purchase money.

4. PURCHASER—REAL BIDDER BOUND. Where a bid is made at an
assignee's sale by an irresponsible bidder on behalf of his
principal, the principal will be considered as the real party
in interest and will be bound by the bid.

5. ASSIGNEE IN BANKRUPTCY—DUTY TO NOTIFY PURCHASER BEFORE
CANCELLING BID. An assignee in bankruptcy who cancels a
bid made at an assignee's sale and resells the property with-
out notifying the first purchaser, does not act in good faith.

6. REVERSAL OF DECREE—EFFECT ON SALE. Where a decree under
which a judicial sale has taken place is reversed on appeal
the validity of the sale is not impaired. But where the valid-
ity of the sale is the subject of controversy a different rule
applies.

*Cooper, Garnett & Packard* and *Crane & Tatham,* attor-
neys for petitioners. *Henry Crawford,* of counsel.

*Tuley, Stiles & Lewis* and *Ayer & Kales,* attorneys for
Conro & Carkin and Henry Fox.

*Tenneys, Flower & Abercrombie,* attorneys for Bradford
Hancock.

DRUMMOND, J., delivered the opinion of the court:—

The consequences of delay in the decision of this case are
so serious that I have come to the conclusion that I would
dispose of the petition in review at the earliest practicable
moment.

It is objected that it is improperly brought into the circuit
court, under the second section of the original bankrupt law
(sec. 4986, Rev. Stat. U. S.), which provides for a review
of any decision of the district court, and which declares:
"The circuit court for each district shall have a general su-

perintendence and jurisdiction of all cases and questions arising in the district court for such district when sitting as a court of bankruptcy, whether the powers and jurisdiction of a circuit court have been conferred on such district court or not, and except when special provision is otherwise made, may, upon bill, petition or other proper process, of any party aggrieved, hear and determine the case as in a court of equity.'' [1]

This law provides for the superintendence and jurisdiction of the circuit court over all cases and questions arising under the act; and unless special provision is otherwise made, it declares how the court shall exercise this supervision and jurisdiction. Therefore, unless the law has provided elsewhere for an appeal from the decision of the district court in this case, it must necessarily come up under the second section of the bankrupt law. Rev. Stat. sec. 4986.

It is not necessary that I should go into a history of the case; that has been done by the district judge. It is only of importance that I should state the fact that Fox & Howard, having become bankrupts, and a provisional assignee having been appointed, on his application to the district court he was directed to receive bids for the property of the bankrupts; and he accordingly received a bid from J. Hodgkins, on the 2d day of July, 1875, for certain property of the bankrupts, for which Hodgkins agreed to pay the sum of $40,000. An order *nisi* was thereupon entered by the district court requiring all parties to show cause why that bid should not be received, and on the 9th of July following the same was confirmed to Mr. Hodgkins. On the 12th of July following, on application of the assignee to the district court, this order of confirmation was set aside and another bid was received and confirmed to other parties on an advance in the price, $40,500, and the sale was confirmed to them and the money paid, and the property turned over to the new purchasers.

It is these sales and confirmations made by the district court that are the subject of controversy here. And the point is,

[1] See U. S. Rev. Stat. 1874, p. 971.—Ed.

whether or not there is provision otherwise made than in the section already referred to, for the appellate jurisdiction of the circuit court over this action of the district court. I think there is not.

This is simply a sale of the property of the bankrupts; and the question is, whether the sale shall stand as the act of the court, and the property of the bankrupts pass to the purchaser. It is not such a decree or judgment as is provided for in the eighth section of the original bankrupt law (Rev. Stat. sec. 4980), which gives an appeal or writ of error; and unless there is an appeal or writ of error given elsewhere than is provided in the third section, then it necessarily follows that the circuit court must exercise superintendence and jurisdiction over the case under that section.

It is apparent that the question whether or not a sale of the estate of a bankrupt shall stand, is one of the greatest importance. Upon it may depend not only the rights of the bankrupts, but the rights of all the creditors. And it is manifest that the statute intends to give the circuit court superintendence and jurisdiction over such cases. It would be a serious matter to hold that the order of the district court as to the validity of a sale of the property of a bankrupt is necessarily final, and that because the district court has confirmed the sale and turned over the property to the purchaser, and received the money, therefore there is no power in the circuit court to interfere with it. That would be a very simple way of depriving the circuit court of jurisdiction over a case, and it might well happen that property might be sacrificed and the rights of creditors jeoparded by the action of the district court.

It is manifest, I think, therefore, that it was the intention of the bankrupt law to allow the circuit court to have jurisdiction over all cases of this kind; and, inasmuch as an appeal or a writ of error is not elsewhere given, the right of supervision and jurisdiction must exist under the second section of the bankrupt law.

It is said that in this case there has been no record, or, at least, no full record brought into the circuit court, and that

the court has not considered the full record upon which the district court acted. That is true; but it is nothing more than fair to state the circumstances under which the record is brought before this court. A printed abstract of the testimony has been introduced, all of which the court has read. The court has not read all the original testimony, of which this is a full abstract; but the case has been submitted to the court upon this abstract, and was argued, in part, upon the abstract; and it was not until after the case was partially heard, that objection was taken by some of the counsel to the fact that this was not a full record; but, as I understand, it was submitted to the court upon this abstract for convenience, and to save labor and trouble to the court, with the understanding on both sides that, if there was any error or mistake in the abstract, it might be corrected by reference to the original depositions or testimony in the case. I so understand it. And if there is any material error in this record or abstract as it has been presented, of course I desire it to be rectified; and I wish to state to counsel upon both sides that this is the only testimony which this court has considered. But I ought to add, no material error has been pointed out.

That being so, the question is: whether the order of the district court, made on the 9th of July, 1875, confirming the sale to Mr. Hodgkins, and that made on the 12th of July, rescinding the order of confirmation and confirming a sale to other parties, should stand—one or both? When the order was made by the district court rescinding the sale to Mr. Hodgkins and confirming it to other parties, that action of the district court was brought for review before this court, and this court remitted the case to the district court with directions to open that order for the purpose of allowing Mr. Hodgkins or Mr. Crane, for whom it was claimed Mr. Hodgkins made the bid, to be heard, because the confirmation of the sale being made by the district court to Mr. Hodgkins, he became a party in court, and before any order affecting his rights could be properly made by the district court he was entitled to his day in court, to notice, and to be heard. The order of confirmation was set aside without any notice to him

whatever, and without giving him an opportunity to be heard, upon the *ex parte* application of the assignee. This court decided that to be error, and remitted the case to the district court, in order that Mr. Hodgkins and Mr. Crane might be heard upon their right to this property. They were accordingly heard, and the court affirmed its order of the 12th of July, rescinding the order of sale made to Mr. Hodgkins. The material question is, whether that order was right, and should be affirmed by this court. I think it should not, but that it must be reversed. And I will proced to state the reasons why I so think.

The whole action of the assignee, Mr. Hancock, was under a misapprehension of the rights of the purchaser (the bidder) at the sale, which seems to have been shared by the district court. He seems to have proceeded upon this hypothesis: That, as soon as the sale was made by the assignee and confirmed, it was the duty of the purchaser at once to pay to the assignee the $40,000 without any demurrer and upon a moment's notice. That was a mistake—a misapprehension of the law.

What was the position of the case as it stood after the bid was received by the assignee and confirmed by the court? This is the order: "It is by the court ordered that the sale of the property to J. Hodgkins, for the sum of $40,000, mentioned in his bid therefor, and the said report of the said provisional assignee thereupon, be and the same are hereby, in all respects, approved, ratified and confirmed; and the said provisional assignee, upon the receipt by him of the sum of $40,000, is hereby authorized and directed to execute and deliver to the said J. Hodgkins all bills of sale or other transfers to pass to and vest in the said J. Hodgkins, his heirs or assigns, all the right, title or interest of said Fox & Howard in and to said property, and to deliver to the said Hodgkins the immediate possession thereof."

What was the effect of that order? It was that, upon the payment of the purchase money, certain acts should be done by the assignee. One of them was, the delivery of the property.

Now, it was the right of the purchaser to examine into the
condition of the property—to ascertain where it was. He
was not bound by this bid until the 9th day of July, when it
was confirmed to him. He had the right to ascertain how
and to what extent it could be delivered to him; whether or
not the order of the court could be or was complied with, be-
fore he could be required to pay his money.

It may be said that the payment of the money and the de-
livery of the property, and the written transfers and bills of
sale were simultaneous acts; but undoubtedly it was the right
of the purchaser to look into this matter and to ascertain
whether or not the order of the court would instantaneously
be complied with.

Now, it is not pretended that in any of the conversations
which took place between Mr. Hancock, the assignee, and Mr.
Hodgkins and Mr. Crane, it was proposed that the order of
the court on his part should be fully complied with. True,
the assignee said that he was ready to deliver over the prop-
erty; but some of the property was not only not in the dis-
trict, but it was out of the state, and it might be a very seri-
ous question whether or not it was the duty of the assignee
to deliver over the property to the purchaser here; but whether
that be so or not, it was the right of the purchaser to take the
opinion of the court upon that subject, and not allow the as-
signee to prescribe dictatorially a rule to him as to when and
how he should pay the $40,000.

Undoubtedly the court might have prescribed, in the order
that a certain sum of money, as a deposit, should be paid by
the purchaser to satisfy the court that it was a bid in good
faith. That was not done. The court required the whole
sum of money to be paid down at once, under certain circum-
stances. Certainly it was the right of the purchaser to have
the judgment of the court on any doubtful questions involved
in the order of confirmation. The confirmation was made on
Friday, and the order of rescission was made on Monday
There was just one business day intervening between the day
of the confirmation and the date of rescission.

Now, I am obliged to say, on this evidence, that Mr. Han-

cock, the assignee, has not acted in good faith, either with the purchaser or with the district court.

Let us see whether the facts do not bear that out. The assignee says that he did not know that Mr. Crane was interested in this bid until Saturday, the 10th of July. It is clear that he is mistaken upon that point. Numerous witnesses contradict him clearly; and there can be no doubt, in examining this testimony in a candid and impartial manner, he was, to say the least, under a misapprehension. He actually did know that Mr. Crane was interested in the bid, and that he was the responsible party, on the day that the bid was confirmed, namely, Friday, the 9th day of July. And yet he is very positive to the contrary. The assignee says, on page 271: "I say I hadn't heard Crane's name mentioned in this connection—in connection with this bid—up to and before Friday, July 9. I swear to that, as a positive, definite fact." Whether he means that he didn't hear it *until* the 10th, there perhaps might be some question. "The reason I am so positive is, that they were all strangers, and they might have mentioned the name of Crane and of Smith or of Jones, or of any other man. What I mean to be understood is, that I never heard the name of Crane mentioned in connection with this matter in any way, so as to call my attention to it, at any time, up to Saturday, July 10." It is first, "up to the evening of July 9," and then afterward, "up to Saturday, July 10."

Then, on page 245, he says: "The first I heard that Crane had anything to do with this bid was from Mr. Hodgkins, on Saturday afternoon."

It is clear, upon the other testimony in the case, that Mr. Hancock was in error in this respect. He says that he was in the habit of making memoranda, or keeping a sort of diary of his business, and especially, as I understand him, of his bankruptcy business. He generally put down, the very next day, what he had done the preceding day, but the inference is that he didn't do it always; and I think the experience of every person who undertakes to keep a diary is, that unless he keeps it regularly and promptly, or if he allows a few days

to pass by without making the entry, he is very apt to confound what was done on one day with what was done on another; and it is clear that Mr. Hancock, in this case, did confound what took place on Friday with what occurred on Saturday; at any rate, the testimony is conclusive that he was notified on Friday, the day of the confirmation of the sale, that Crane was interested in it, and that he was the responsible party from whom the money was to come.

It is true that Mr. Hancock says that he made several demands on Mr. Hodgkins for this money, Friday and Saturday, and that he did not respond to them; but, as I have said, he made them under a false impression as to his right and that of the purchaser.

And again, whether he did or not, I hold that as soon as he was apprised that Mr. Crane was the responsible party from whom the money was to be received, that he should have done nothing affecting his rights without giving him notice. He says that he did not consider Mr. Crane as being the bidder; that he had nothing to do with Mr. Crane; that the only person that he had anything to do with was Mr. Hodgkins. That was a mistake—a misapprehension on his part. As soon as he was informed that Mr. Crane was the responsible party, he, the person who was making the sale and who was acting under the direction of the court, should have acted in entire good faith toward him.

Now, did he? There is one fact indisputable, namely, that on Saturday afternoon he was notified that the money was to come from Mr. Crane, and he had an interview with him, and he was told by him that the bid was a *bona fide* bid, and that the money would be paid. He didn't ask Mr. Crane at that time for the whole of the purchase money; he only asked him then that there should be a deposit made—which was the true view to take of it.

And they separated upon the understanding that a deposit would be made Monday morning—as agreed by both. The amount was not named, and properly so, because that was a matter for the court to determine—what the amount of the

deposit should be—until the purchaser could have an opportunity of looking into the matter.

I am obliged also to differ from the district court in holding that Mr. Crane was not bound by the bid. I think he was. Mr. Hodgkins was, confessedly, an irresponsible party; he had not the means or ability to raise $40,000. He was directed by Mr. Crane to make the bid (in whose name was not stated), and did it accordingly; but out of that personal sufficiency which we so often see, instead of putting it in in the name of his principal, as he ought to have done, he put it in in his own name; but still the principal who was behind was bound for the bid, for, though a contract under the statute of frauds must be in writing, yet the appointment of an agent who makes it may be by parol.

There is not any satisfactory testimony in this case to indicate any bad faith on the part of Mr. Crane throughout this whole business. On the contrary, as soon as he was notified by the assignee, he told him it was a *bona fide* bid, and that the money should be forthcoming Monday morning; and the whole conduct of Mr. Crane is consistent with this view. The negotiations which took place between him and other parties, by which they were to have an interest in the property purchased, proceeded upon the assumption that he was the responsible bidder, and that if his bid were accepted (as it had not then been when these negotiations occurred), he was to let the other parties have an interst—and Hodgkins among the rest.

Now, what was the conduct of Mr. Hancock? He was told by Mr. Crane that the money should be forthcoming Monday morning, *the first thing* Monday morning, as Mr. Hancock says, though that is denied by other testimony. But suppose that to be so, when was it to be forthcoming? Did not the circumstances require good faith from Mr. Hancock to Mr. Crane when he was told the money was to be forthcoming the first thing Monday morning? Certainly. How was his action after that? He went directly from Mr. Crane and entered into negotiations with other parties to make a bid

for this property without waiting till Monday morning, or even Sunday morning, and said to them: ''If you will put in a bid for $40,500 I will recommend its acceptance.'' Early Monday morning the assignee went to the judge and asked that the order of confirmation made on the 9th be rescinded, and that another bid should be accepted. Was that acting in good faith to Mr. Crane? The assignee was supplied with abundant information, not a particle of dissent arsing from any quarter, and therefore knew Saturday night that Mr. Crane was an entirely responsible party, that he was good for the bid. After all this had taken place, the assignee negotiated with another party for a different and a higher bid, without notice to Mr. Crane, and went into court Monday morning and claimed that he had asked—not Mr. Crane, but Mr. Hodgkins—repeatedly for the payment of the purchase money, and that he had declined to pay; and the court, upon his *ex parte* statement, without notice to Hodgkins, or anybody else, rescinded the other.

Then I think it is clearly shown that Mr. Hancock did not act in good faith with the court, and, for the reasons and facts that I have stated, which are uncontradicted, and which are admitted by Mr. Hancock, because he admits that he parted from Mr. Crane on Saturday night under the expectation that the deposit would be made on Monday morning. Now it could not be expected a man would have the necessary amount by him. It is to be presumed, and I think we may take notice of the fact, that it was necessary for Mr. Crane to go to some bank on Monday morning and obtain this sum.

Before Mr. Crane had an opportunity of obtaining any considerable sum and tendering it to Mr. Hancock or to the court Monday morning, the application had been made by Mr. Hancock. He made application to the court, it seems, early; the court, at the moment, declined to make the order. Afterward, on a subsequent application, the court made the order, but still, all without notice to the purchaser.

At ten minutes after eleven o'clock on Monday morning Mr. Crane appeared before the assignee with two certificates of deposit of $10,000 each, which are conceded to have been good

for the amount, and tendered them to Mr. Hancock in compliance with the agreement made between them on Saturday night, and Mr. Hancock said, "It is too late; I have sold the property to some one else, and the sale has been confirmed." This, all without any notice, or without any hint so far as appears, to Mr. Crane.

Now, was this acting in good faith? Was this properly discharging the duties of an assignee? Although this was a sale made by the court, it was—to speak more correctly—made by the assignee, under the direction of the court.

The assignee was the party who advertised and received the bids; he was the agent of the court. Of course he could do nothing without the consent and the ratification of the court, and as the agent of the court, and, therefore, intimately connected with the action of the court. Naturally, the purchaser had some right to rely on the declarations of the assignee, and to expect good faith from him.

Now, it is most clear, I think, that if the court had been notified on the morning of Monday, the 12th, that Mr. Crane was the responsible bidder, and that he had said Saturday night that he would bring a deposit upon the bid Monday morning, the court would not have made the order that it did. I still think that when the attention of the court was called to it immediately, as it was, and the court was informed of what had taken place, and of the understanding, it was the duty of the court to arrest all proceedings. The property had not then been delivered over. Whether the money had been paid or not, I do not know, but, at any rate, the money paid by the purchaser was in the control of the court, and I think it was the duty of the court, at that moment, to give Mr. Crane a hearing, in order that equity might be meted out to these parties, and that no unfair dealings should be practiced between them, especially by, the assignee, an officer of the court.

It is for these reasons that the order which was made by the district court on the 12th of July must be reversed, because it is apparent that Mr. Crane, who was the responsible party, had not been fairly dealt with in the purchase which

he had made, and when he brought his money, as he did, as soon as it could be expected—he came and insisted it was nothing more than a reasonable time, between the confirmation of the bid and Monday morning, to give him an opportunity to ascertain the situation of the property and to see whether it was forthcoming, and whether the order of the court made on the 9th could be complied with.

I have considered this case independent, so far, of the rights of the purchasers. It is true that Conro and Carkin made a bid subsequently at the request of the assignee, and they paid their money into court, and the property was delivered over to them.

It is claimed, because that was done this court has no power over this sale; in other words, that the parties who may be affected by this sale, and this act of the district court are obliged to go into a court of chancery and file their bill. How could they do that without admitting the validity of the sale, or without taking the confirmation to Conro and Carkin, as vested in them the title to this property? That was the objection made to the filing of a bill in chancery, which it was thought could not be done so long as there was the order of the district court standing, confirming the sale to Conro and Carkin.

But, it is claimed that because when a judgment or decree is rendered, and a sale takes place under it, and a writ of error or appeal is taken to a higher court, and the judgment or decree reversed and that does not impair the validity of the sale, the same rule applies here.

The principle is well established. Why? Because the question is not there as to the validity of the sale, but as to the validity or right of the decree or judgment. It is the decree or judgment that may be set aside, and not the sale.

In this case, the very words of the order of sale, *ipsissima verba*, are the subject of controversy; whether the sale should stand as the order of the district court. It is not a sale made under a decree of the district court, but it is the order of sale itself by the district court, in an ordinary bankruptcy proceeding, and the question is, whether this sale shall stand. I

insist in all such cases the purchaser takes the property, if delivered over to him, and he pays the money, subject to the supervisory power of the circuit court over the sale.

As I said in a former part of this opinion, it would be a very easy matter to get rid of the supervisory power of the circuit court, to confirm a sale and deliver over the property and receive the money. That, certainly, was not the intention of the act of congress, as is apparent from the fourth section of the amendment of 1874.

There is one question which I have not considered, and which I shall leave open, because it was not discussed, and I desire to give the parties an opportunity to argue it. That question is as to the effect of the confirmatory order of the court made on the 9th of July, whether or not it was competent for the court, before the money was paid, if Hodgkins or Crane was ready to pay, upon the receipt of a higher bid, to set aside the previous order and to direct the assignee to transfer the property to the purchaser; that is, perhaps, not clear. It may be that it was the right of the first purchaser, upon the payment of the money, to hold the property, because it will be observed that this was not a case of the whole proceeding being *in fieri,* when the power of the court over the matter was plenary when bids were being received, but it was after a confirmation was made of the sale. I do not wish to foreclose the parties in relation to that question.

It is claimed that the bid which was made by Conro and Carkin was a higher bid and better for the estate, but if the court was inclined to receive a higher bid, and had a right to do so before the money was actually paid, and could do away with the confirmatory order of July 9, it was its duty to give that purchaser to whom the sale had been confirmed equal rights with the subsequent purchaser, because that was giving the subsequent purchaser an unfair advantage; it was saying to him after the order confirming the sale—"If you will come in and bid a higher price, the sale shall be made to you, without giving the other party the same opportunity of making a higher bid."

If the court allowed an increased bid, it ought to have per-

mitted it to come as well from the party to whom the sale had been confirmed as from a stranger.

That also is a question I do not now decide. It was not discussed, and if the parties desire it I will leave that open; that is, whether this court shall direct the property to be resold, taking the bid of Mr. Crane at $40,000, or whether, upon the payment of the money, the court shall direct the sale to be directly confirmed to him. All that I now do, is to reverse the order of the district court made on the 12th of July, with costs.